Filed 4/22/22; Certified for publication 5/17/22 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re M.V. et al., Persons Coming Under the Juvenile Court Law. | D079473 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ15751A, B) |
| v. | |
| J.V. et al., | |
| Defendants and Appellants; | |
| M.V., a Minor, etc., et al., | |
| Appellants. | |

APPEALS from orders of the Superior Court of San Diego County, Michael Imhoff, Commissioner.  Reversed and remanded for further proceedings.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant J.V.

1

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant M.Z.

Lelah S. Fisher, under appointment by the Court of Appeal, for Minors and Appellants M.V. and I.V.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

After declaring them dependents of the court, the juvenile court removed M.V. and I.V. (together, Children) from the physical custody of their parents, J.V. (Father) and M.Z. (Mother), and placed them with a relative caregiver pending reunification efforts. Father, Mother, and the Children appeal those dispositional orders. They assert substantial evidence does not support the court's findings, by clear and convincing evidence, that there was substantial danger to the Children if they were returned home and that there were no reasonable means to protect them without removing them from their parents' custody. On the record before us, we agree. Accordingly, we reverse the dispositional orders as to both Father and Mother.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

*Dependency Proceedings Before the Children's Removal*

Father and Mother had been together for about five years when dependency proceedings were initiated in June 2021. Later that same month, they married. They have two children, M.V. and I.V., who were at the relevant time three and two years old, respectively. Father also has joint custody of his six-year-old son, A.V., from a previous relationship. The family

2

lived in "an RV" or a "small[,] manufactured trailer" on a nursery lot, where Father worked.

The family came to the attention of the San Diego County Health and Human Services Agency (Agency) on December 11, 2020, when Mother was arrested after law enforcement determined she was the "domina[nt] aggressor" in a physical altercation with Father. Father, who had called 911, told the deputies Mother became angry, threw a coffee cup at him, cutting his wrist, broke the window of their family truck, and punched herself in the face.[1] Mother told the deputies that Father threw shoes at her, struck her face with his hand, knocked the television to the ground and, although she did not see him do it, she heard Father break the window of the truck. Mother also reported that Father struck then one-year-old I.V. in the face. When the deputies spoke with then five-year-old A.V., the child said he saw Mother throw a coffee cup at Father and Father bleeding; Father hit Mother but he could not say where it happened or how he hit Mother; and Father did not hit I.V. Father had a one-inch cut to his wrist, Mother had visible redness to her cheek, and the passenger-side window of the family's truck was broken. All of this occurred with the Children in the home.

Immediately after the incident, the parents agreed to a safety plan where Mother would take the Children and stay with maternal grandmother in Los Angeles. Then on January 6, 2021, the Agency approved of the parents and the Children residing together with maternal great grandmother (MGGM) staying in the home until the parents were connected to services.

---

[1]     Father is a Spanish speaker and his statements were translated from Spanish to English by a deputy sheriff.

On January 15, the Agency opened a voluntary services case for the family and the parents agreed to take domestic violence and parenting classes.

In the Agency's view, however, the parents only participated "minimally" in services and had not made progress in addressing the protective issues that necessitated the Agency's involvement. By June 2021, Mother had attended only two of the domestic violence classes and was dropped from the parenting classes for excessive cancellations after attending six classes. Father had attended two of five domestic violence classes; he had missed some classes due to being hospitalized for stomach cancer. He was, however, participating consistently in his parenting classes since January.

On June 3, 2021, the Agency received a report through its child abuse hotline of another incident of domestic violence between the parents in the Children's presence. On June 2, A.V., now six years old, was playing with M.V. and accidentally hit her. Mother yelled at A.V., called him derogatory names (" 'malparido (bastard)' " and " 'pendejo (stupid)' "), and told him his biological mother does not love him. Mother then angrily splashed soda on Father and A.V. That same day, Mother hit A.V. on the neck with a sandal when she believed A.V. was playing "rough" with the Children. Later that night, after all three children went to bed, Mother yelled at Father to erase videos he had recorded of her earlier being angry and yelling at the children. Mother was pulling Father's hair, when A.V. woke up. The child started to hit Mother to defend Father.

The same day it received the hotline referral, Father called the assigned social worker, C. Morales. He reported that Mother had been having angry and aggressive outbursts with A.V. and the Children. On June 2, she had been " 'verbally and physically aggressive' " towards A.V. and had been taking her anger out on him. Father reported that Mother "started

4

'going off' on him" the day before on June 1, calling him " 'Viejo ojete, pendejo, pito chiquito, (fucken old man, stupid and small penis).' " "[S]ometimes the children are in the same room" and " 'can hear everything.' " Father told the social worker Mother's "behavior changes constantly" so he video recorded her. Father claimed that in one recording, Mother pulled his hair and, in another, she grabbed a knife. During one of these incidents, Mother struck him with a "BB gun."

Morales and another social worker went to the family home on June 3, 2021. Father showed them a video recording on his cell phone. It showed Mother yelling and "extremely angry." Mother was "waving her arms and pointing at the father," "moving in and out [of] the father['s] face as if she wanted to hit him and [A.V.] who was sitting next to the father." M.V. and I.V. were standing near Mother, with facial expressions suggesting "they were frightened." Mother was yelling at Father and referred to A.V. several times by a derogatory name (" 'ese hijo de puta (that son of a bitch).' " At one point, she "launch[ed] forward to grab for [A.V.]" but Father covered the child. Mother slapped Father, either to hit him or to stop him from recording, kicked him once, threw an object at him, grabbed and shook a soda can and spilled it in his direction.

Father told the social workers that after the incident in the recording, Mother demanded he delete the recordings. It was then that she pulled his hair and struck him with an "unloaded BB gun," once on his leg and once on his foot. A.V. woke up and tried to hit Mother to defend Father. They all went back to bed after Mother calmed down. But the next morning, Mother threw rocks at Father and called him names. When she left with the Children, he took the opportunity to call Morales. Father told the social

5

workers there were more video recordings and agreed to email them to the Agency.

Father told Morales he "thinks about [the] children" and called the Agency to get advice on what to do. He reported he was "tired of the situation and [was] willing to do anything he can." Morales explained to him that "one of [her] biggest concerns [wa]s that he was filming the mother instead of grabbing the children, leaving with them, and/or calling law enforcement." When Morales asked Father why he did not call the police, Father said he "feels bad about how I.V. will react," because I.V. was "most traumatized" when Mother was first arrested. He also told the social worker that Mother threatens him because of his immigration status. Morales then explained to Father "the children might not be able to stay with him because he did not protect the children when the mother had a mental health crisis" and she knew Father had "those protective capacities as [she had] seen them in the past when he called law enforcement."

When Morales called Mother, she initially refused to speak with her and said she was not willing to work with the Agency. Later, she agreed to safety plan with the Agency and told Morales her side of the story. She explained that A.V. hit I.V. on the arm with a sandal. Mother told them not to fight, but 20 minutes later A.V. threw a sandal at M.V. So Mother threw the sandal back at A.V. and asked him if he liked being hit with it. Although she was not aiming to hit him, the sandal "landed near" A.V.'s neck. Mother said she and Father began to argue because he does not discipline A.V.

Morales told Mother they had watched a video recording of her "going after" A.V. Mother said that incident happened the day before, on June 2, and she was angry with Father because "he never does anything when [A.V.] hits her children." Morales explained her concerns that Mother was seen in

6

the video yelling, angry, "out of control," kicking Father, throwing stuff at him, all in the presence of the children. In response, Mother "put her head down and did not want to make eye contact" with Morales. Mother then explained she got angry later that night because Father appeared pleased with the video he had recorded. When Morales asked what happened, Mother responded, " 'Didn't you see the video? It's all in the video.' " She explained Father had provoked her and she " 'pulled his hair, grabbed the BB gun, and hit him on the foot.' " A.V. woke up and tried to hit her on the back, so she told him not to hit her.

Mother told Morales she was willing to safety plan and she agreed to leave the family home. After Morales spoke with the parents on June 3, the Agency implemented a safety plan where the Children would stay in the home with Father. Mother left the home and went to stay with a friend in Tijuana. She saw the Children under the supervision of a third party.

On June 8, 2021, Father recanted his statements to Morales and said he had called the Agency because he was mad at Mother. He claimed the video recordings were " 'not new' " and that " 'there [were] no videos.' " He said he was no longer willing to work with the Agency because the children were fine and he had not seen any help from the Agency. He reminded Morales that she had told him the Agency would take the Children from him because he did not call law enforcement and was not protecting the Children. Father said "either way, he would be hurt in this whole situation." Morales then told Father she believed he was "scared, frustrated, and wanted to do something to protect the children and that is the reason he called [her], because he needed help." Father simply "stayed quiet."

On June 10, 2021, the Agency filed dependency petitions on behalf of M.V. and I.V., alleging they were at a substantial risk of serious physical

7

harm as a result of the parent's failure or inability to adequately protect them, pursuant to Welfare and Institutions Code section 300, subdivision (b)(1).[2]  The Agency alleged the Children were "periodically exposed to violent confrontations" between the parents on December 11, 2020 and, from June 1 to June 2, 2021, the Children were present when the parents had "several arguments . . . involving hitting, hair-pulling, and thrown objects." The Agency stated they had "ongoing concerns" for the Children because the parents have "failed to walk away, contact the support network, seek out professional help, and/or contact law enforcement when the [C]hildren's safety are at risk."  The Agency detained the Children out of the home pursuant to protective custody warrants issued the same day.

At the detention hearing on June 11, 2021, the juvenile court found the Agency had made prima facie showings in support of the petitions, detained M.V. and I.V. out of their home, and ordered liberal supervised and separate visitation and reunification services for Mother and Father.  The Children were later placed with a relative caregiver, their maternal great aunt.

On July 1, 2021, the juvenile court granted the Agency discretion to lift the requirement that the parents visit the Children separately.  On July 22, the court additionally granted the Agency discretion to lift supervision of the parents' visits.  Counsel for the Children told the court she was "definitely looking closely" at unsupervised visits for Father, based on reports that he had gained "a lot of insight" from his domestic violence classes.

---

[2]    All further undesignated statutory references are to the Welfare and Institutions Code.

8

II.

*Combined Jurisdiction and Disposition Hearing*

The combined jurisdiction and disposition hearing was held on September 9, 2021 by video conference due to the ongoing COVID-19 pandemic. The juvenile court received in evidence the Agency's detention report, jurisdiction and disposition report, and various addenda reports. The court heard testimony from social worker R. Amaro, MGGM, and Mother. Father did not testify.

A.    *Agency's Reports*

At the time of the Agency's July 2021 jurisdiction and disposition report, both parents were "compliant with the Agency" and "engaged in services," and both had expressed their intention to reunify with the Children. Mother and Father had been visiting the Children twice a week "consistently" and the visits went well. However, the Agency remained "extremely concerned" about the Children's safety in the parents' care because of their "unpredictable relationship" and lack of a safety network. In particular, the Agency was concerned about the parents' recanting of their earlier reports of domestic violence in June and "lack of transparency" with the Agency. During the Agency's scheduled visit at the family home on June 25, 2021, both parents denied any additional incidents had occurred since December 2020, despite Father's report of continued domestic violence to the Agency on June 3, 2021. In particular, Father denied ever showing any videos to the Agency.

In August 2021, Amaro made an unannounced visit to the family. The entire family, including maternal grandmother and MGGM, and the relative caregiver were at a barbershop for I.V.'s haircut. The family then went to an ice cream shop across the street. Amaro had "no concerns" during the visit

9

and found it "worth noting [that] it was great seeing the family together, the children seemed very happy and the parents were cordial."

Father reported to the Agency that he had been enrolled in domestic violence classes since March 2020 and had three more parenting classes to finish the program. He told the Agency he had learned that " 'yelling at each other is domestic violence' and if the children are exposed to this, the children could develop 'anxiety and sleeping problems.' " He said that he and Mother were "more 'united, [he] learned to appreciate [his] wife and [his] children.' " Amaro "commended" Father for his insight. The Agency received a report from Father's domestic violence counselor confirming his statements. Indeed, the counselor stated that Father was "exceeding . . . program expectations," "ha[d] changed positively in terms of attitude and contribution to the group," was "working on enhancing his insight as to the effects of domestic violence on himself and others," and he "add[ed] value to the group."

Mother reported she was also doing well in her classes and would be finished with parenting classes in September 2021. She told the Agency she had learned to resolve disagreements with Father by busying herself and giving herself space from Father. She and Father had agreed that " 'if [they] are sad, or do not agree, the person who is upset would leave the home, if something bad happens [she] would call the police.' " She said she had been reading more about domestic violence and its impact on children, adding that she learned to " 'think before acting because [they] need to be role models to [their] children.' " Mother's domestic violence counselor reported to the Agency that Mother was participating "at expectation," was "punctual" and "contributes on topic[s]."

Amaro, however, told the parents the Agency was still concerned about their "lack of transparency" and continuing denial that other incidents had

occurred.  But she also "commend[ed] them for following through" with their case plan and "appreciate[d]" that Mother sent her text messages every week to report the time and date of their visits with the Children.

MGGM told the Agency she was willing to move in with the parents so the Children could return home.  She had lived with the parents from February through early April 2021 as part of their voluntary safety plan.  But she left to visit her daughter in another state and when she returned in June 2021, the Children had been removed by the Agency.  She told Amaro the parents had " 'learned their lesson' " and were enrolled in therapy to work on their marital problems, but she believed they still needed to work on their communication.  When asked to elaborate, MGGM explained Mother yelled at Father when he asked Mother what MGGM wanted to eat, rather than asking MGGM directly.  The parents, however, were "receptive to feedback" by MGGM regarding their interaction.  MGGM told the Agency she has high blood pressure, suffers from a heart murmur, and needs to see her doctor "periodically."  MGGM, who speaks Spanish as her first language, said Mother "bullies" her by making fun of her English pronunciation.  As for Father, MGGM believed he was "arrogant" and "machista" (i.e., a male chauvinist).

The relative caregiver told the Agency the parents' joint visits with the Children have been going well.  She stated she did not trust MGGM to supervise the parents' visits because Mother " 'knows how to manipulate [MGGM].' "  As an example, she explained she heard Mother " 'yelling' " at MGGM for sharing with the Agency that she takes medication.  The relative caregiver also did not believe MGGM should live with the parents because she had medical problems and did not trust MGGM to stay alone with the Children, as she sometimes would fall asleep while watching them.

11

B.    *Social Worker Amaro's Testimony*

Counsel for the Agency did not present any testimony by Amaro on direct examination, or redirect examination; instead, she submitted on the Agency reports. The following testimony from Amaro was elicited on cross examination by counsel for Father, Mother, and the Children.

The Agency assessed whether MGGM moving in with the family would eliminate the need to remove the Children from their parents. The Agency, however, determined that option was not a sufficient safety plan because of Mother's relationship with MGGM. Amaro explained it was reported to her that Mother called MGGM "to yell at her because [MGGM] had communicated with the Agency."[3] That was the Agency's "only" or "main concern" and "why [it] didn't move forward with placing the [C]hildren with the parents."

Amaro admitted the Agency had not considered other alternatives to eliminate or prevent the need for the Children's removal, including requiring Mother to move out of the home. She testified:

"Q . . . Has there been any assessment of a different situation with trying to have the children possibly live in the home with the Father with the Mother moving out?

"A *The Agency did not explore that option at this time.*

"Q Why not?

"A *Well, that wasn't something that was explored.*

"Q Okay. Well, do you think the children would be safe in the home with the father if the mother didn't live there?

"A *That's something that would have to be explored with the father.*" (Italics added.)

---

[3]    This appears to be a reference to the relative caregiver reporting to the Agency she heard Mother " 'yelling' " at MGGM for sharing with the Agency that MGGM takes medication.

To explore the feasibility of Mother moving out, Amaro explained the Agency would need to know who was going to care for the Children while Father worked "from home" in the nursery where the family lived. She acknowledged the Agency did not determine whether MGGM was willing to provide daycare while Father worked on-site. Moreover, she initially could not think of any risk posed by that plan:

"Q What would be the risk in a scenario where while the father was gone the maternal great grandmother supervised the mother with the children just for the daytime hours and then the father had his children at night with the mother not there[?]

"A That's something that we can -- *that's something the Agency can explore.*

"Q Okay. So is that something you just didn't think of?

"A *Not at this time.*" (Italics added.)

Amaro was then asked if she would "have any reason to think" the parents would violate a plan where the Children lived only with Father and MGGM. Amaro responded she would have "some concerns" based, again, on the report that Mother was "yelling or communicating" with MGGM. Amaro then testified her concern would remain even if they "took the mother out of their actions with the [MGGM]," because the *relative caregiver* had reported to the Agency *her* concerns about MGGM's health and ability to care for the children. The Agency also did not explore whether the relative caregiver could provide daycare for the Children while Father worked, but Amaro noted there was some distance between the family home and relative caregiver's home.

Amaro believed Mother would need to move out of the home if the court placed the Children with Father, with or without MGGM in the home. The reason: the parents "haven't taken advantage of the[ ] opportunities" to

13

"show that they can change." Earlier, however, she testified that Father was participating in domestic violence and parenting classes and was "doing extremely well" in them. Amaro explained there were reports the parents were "still having some arguments" and "problems communicating." Although she acknowledged Father's progress, she explained the parents had not shown change because they continued to be in "denial" about their domestic violence. So while Father is "learning about domestic violence," Amaro believed he had not taken responsibility for the incident that occurred on June 1 or June 2.

Amaro acknowledged the Agency's safety plan in response to the June 2 incident was to have Mother leave the home and the Children continue to reside with Father. And the parents complied with that safety plan, as Mother only returned to the home after the Agency had removed the children pursuant to the protective warrants on June 10, 2021. Notably, Amaro was asked, "with the mother out of the home and the father caring for the children, . . . what is the safety risk of the children being placed with the father?" Amaro responded: *I can't think of any safety risk right now placing [the Children] with the father.* (Italics added.)

C. *MGGM's and Mother's Testimony*

Through a Spanish language interpreter, MGGM testified she had lived in the parents' home and helped care for the Children, from January through March 2021. She was willing to move back into the home with the family in order to prevent fighting and keep the Children safe. However, she said she was not willing to move in with the family if Mother moved out of the home, "because [Mother] is very careful with the children." MGGM had no concerns about Father's ability to care for the Children. But Father was always working and would not have time to spend with the children, and she believed it was "important for the [C]hildren to have both of their parents."

14

MGGM acknowledged that Father has never left the Children with someone who was not safe. She denied that Mother bullied her and explained Mother joked a lot about MGGM's English language skills. She denied that Mother got mad at her for telling the Agency about her medical issues, and denied having any medical condition that would prevent her from caring for the Children.

Mother testified she had been participating in domestic violence and parenting classes and would complete her parenting class the following week. She explained the insights she had learned in her domestic violence class. She denied she and Father have had any arguments or physical altercations since December 2020.

D. *Juvenile Court's Findings and Orders*

The juvenile court found the allegations in the petitions true by clear and convincing evidence and took jurisdiction over the Children pursuant to section 300, subdivision (b). Although the court found it to be "sort of a difficult case because there's so many contradictory statements and recantations," it found the parents' earlier reports of domestic violence "more credible" than their subsequent denials.

As to the proper disposition, the Agency argued there was clear and convincing evidence to remove both M.V. and I.V. from the parents. It argued it was "not yet safe" to place the Children with the parents because they "are still in denial about what's going on." The Agency had assessed whether MGGM residing in the home could prevent their removal but the Agency had concerns.

Counsel for Father, Mother, and the Children opposed removal, asserting the Agency had failed to make reasonable efforts to prevent their removal. Counsel for the Children specifically argued there was not clear

and convincing evidence that the Children could not be safely placed with Father on the condition that Mother move out.

The juvenile court agreed with the Agency. It ordered removal of M.V. and I.V. from both parents and placed them with the relative caregiver. It found, by clear and convincing evidence, there was substantial danger to the physical health or physical or emotional well-being of the Children if they were returned home and there were no reasonable means to protect them without removing them from the parents' custody, pursuant to section 361, subdivision (c)(1).

The juvenile court first noted that "there are a lot of positive things that have been presented to the court," including that there was a "supportive extended family." It also found "the interaction of the family indicates that there is great potential here," as indicated by the parents' recent visit with the Children at the barbershop and ice cream shop. It later "stress[ed] again" that "there . . . is amazing potential here" for the family.

However, the juvenile court found it was "not safe" to place the Children with the parents, because "the plans that have always been submitted for consideration . . . is that the parents never waste an intention of living separate and apart and not parenting the children [separately]. And indeed, the mother's been back in the home for a period of about 90 days or so." The court stated: "It would appear to the court that if the parents truly understood the safety issues, that that fundamental concept would have been articulated whether they needed to coparent at this time together or whether they did need to parent separately. And I have nothing before me that indicated that the father has thought that through[.]" It continued: "The court is very hesitant to place [the children] with the father without him specifically taking affirmative steps to secure a residence for himself and the

16

children, whether that is having the mother move out or getting an entirely different residence." The court concluded "there is no hope for a safety plan" because "neither parent acknowledge[d] that there are events and behaviors that need to be addressed and changed." In making its jurisdictional ruling, however, the court stated its belief that "the parents will be successful if they work on those issues in their programs."

In making its findings, the juvenile court specifically addressed whether the Children could be safely returned to a parent's custody with MGGM in the home. Although it found MGGM to be "a very wise woman" and "well-intentioned," the court found she was "not an option as far as reasonable means" because she was only willing to move in with both parents but not Father alone. The court concluded: "I don't believe that the Agency failed to undertake reasonable efforts regarding just placement with the Father when the *Father never affirmatively or proactively requested that* [they be placed with just him]. At the same time he's living with the Mother. So I certainly *hope that that can be broached in the future*." (Italics added.)

DISCUSSION

I.

*Relevant Legal Principles*

"The fundamental right to the care and custody of one's child is protected by constitution and statute." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525 (*Henry V.*); accord *In re Jasmon O.* (1994) 8 Cal.4th 398, 419–420; *In re James T.* (1987) 190 Cal.App.3d 58, 64.) "A child may not be taken from a parent's physical custody during juvenile dependency proceedings, except for a temporary detention period, unless clear and convincing evidence supports a ground for removal specified by the Legislature." (*Henry V.*, at p. 525.)

17

Section 361 is the governing statute, and it imposes restraints on the juvenile court's authority to remove a child from a parent's physical custody. (§ 361, subd. (c).) It provides that "[a] dependent child shall not be taken from the physical custody of his or her parents, . . . unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a *substantial danger* to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, *and* there are *no reasonable means* by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1), italics added.) Relevant here, the statute further provides "[t]he court *shall* consider, as a reasonable means to protect the minor," the option of removing the offending parent from the home. (§ 361, subd. (c)(1)(A), italics added.)

Only in a "narrow subset of cases—those [under section 300, subdivision (e)] where a young child has been severely physically abused and the parent was either the perpetrator of the abuse or unreasonably failed to protect the child from the abuse"—is there a "rebuttable presumption that removal is necessary." (*In re E.E.* (2020) 49 Cal.App.5th 195, 218; see § 300, subd. (e).) "In those cases, the fact the court adjudicated the child a dependent under section 300, subdivision (e) serves as prima facie evidence that the child faces a substantial risk of physical harm in the parent's custody and there are no reasonable means to protect the child short of removal. For all other cases, however, the general rule applies and the juvenile court must find clear and convincing evidence to justify removal. (§ 361, subd. (c).)" (*In re E.E.*, at p. 218.)

" 'The elevated burden of proof for removal from the home . . . reflects the Legislature's recognition of the rights of parents to the care, custody and

18

management of their children, and further reflects an effort to keep children in their homes where it is safe to do so.  [Citations.]  By requiring clear and convincing evidence of the risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety, section 361, subdivision (c) demonstrates the "bias of the controlling statute is on family preservation, *not* removal." ' "  (*In re A.R.* (2015) 235 Cal.App.4th 1102, 1115.)

Moreover, "[a] dispositional order removing a child from a parent's custody is 'a critical firebreak in California's juvenile dependency system' [(*In re Paul E.* (1995) 39 Cal.App.4th 996, 1003)], after which a series of findings by a preponderance of the evidence may result in termination of parental rights." (*Henry V.*, *supra*, 119 Cal.App.4th at p. 530.)  Thus, California dependency laws "establish that out-of-home placement is not a proper means of hedging against the possibility of failed reunification efforts, or of securing parental cooperation with those efforts.  It is *a last resort*, to be considered only when the child would be in danger if allowed to reside with the parent.  The law requires that a child remain in parental custody pending the resolution of dependency proceedings, *despite the problems that led the court to take jurisdiction over the child*, unless the court is clearly convinced that such a disposition would harm the child.  The high standard of proof by which this finding must be made is an essential aspect of the presumptive, constitutional right of parents to care for their children."  (*Id.* at p. 525, italics added, citing *In re Kiesha E.* (1993) 6 Cal.4th 68, 76 (*Kiesha E.*) ["Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures."].)

19

We review a dispositional order removing a child from a parent for substantial evidence, "keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence." (*In re I.R.* (2021) 61 Cal.App.5th 510, 520 (*I.R.*).) "[A]ppellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995.) In applying this standard of review, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Id.* at pp. 995–996.) We view the record in the light most favorable to the prevailing party and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence. (*Ibid.*)

## II.

*Substantial Evidence Does Not Support Removal of the Children from Father's Custody*

Father, Mother, and the Children timely appealed the juvenile court's dispositional orders.[4] All three contend substantial evidence does not support the court's findings and orders removing the Children *from Father's*

---

[4] Although Father's notice of appeal challenged both the jurisdictional and dispositional orders, his appellate briefs substantively address and request reversal of only the dispositional orders as to him. Accordingly, we deem Father's appeal of the jurisdictional orders to have been abandoned.

20

custody and seek reversal of the dispositional orders as to Father.[5] We agree.

As noted, section 361 restrains a juvenile court from removing a child from the physical custody of her parents unless there is clear and convincing evidence of *two* conditions: (1) "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child if she is returned home, *and* (2) "there are no reasonable means by which the [child's] physical health can be protected without removing" her from the parent's physical custody. (§ 361, subd. (c)(1).) Accepting the juvenile court's factual findings and all reasonable inferences supporting them (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193), we conclude substantial evidence does not support the court's findings that either of these conditions necessary to justify removal of the Children from Father were proven by clear and convincing evidence.

A.   *There Was Insufficient Evidence of Substantial Danger to the Children If Returned Home to Father's Custody*

The social worker testified, without qualification: *"I can't think of any safety risk right now placing [the Children] with the father."* (Italics added.) Her testimony went unchallenged. In light of that, and the record as a whole, we conclude there was not substantial evidence from which a reasonable fact finder could have found it "highly probable" that there was or would be substantial danger to the Children if they were returned home to Father's custody. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 995–996.)

---

[5]   Only Mother asserts that the court's dispositional orders removing the Children from her custody were also error. We address Mother's contention separately in the next section.

We first note that Father was not the "offending parent." Mother was found to be the "domina[nt] aggressor" in the December 2020 incident by the arresting agency and there were no allegations that Father committed any abuse of Mother in the June 2021 incidents. Instead, the evidence showed he was the victim of Mother's physical and verbal abuse. The Agency's concern with Father was that he failed to protect the Children from exposure to Mother's domestic violence.

Exposing a child to domestic violence is, of course, emotionally harmful and a parent's failure to protect a child from such exposure is relevant in determining if there is risk of substantial danger to a child under section 361, subdivision (c)(1). But as to the Agency's concerns that Father failed to protect the Children, the evidence established that he called 911 to report the December 11, 2020 incident, which resulted in the parents agreeing to participate in voluntary services. It was also Father who called the Agency on June 3, 2021 to disclose there had been additional incidents by Mother. In its reports, the Agency acknowledged that Father demonstrated "protective capacities" and had acted on them when he called law enforcement on December 11, 2020 and Morales on June 3, 2021.

It is evident, from the Agency's reports and Amaro's testimony, that the Agency was mostly troubled by Father's recanting of his June 3, 2021 statements and his so-called "lack of transparency." In particular, the Agency was concerned with Father's subsequent claim that the video he showed the social workers of Mother's abusive conduct was old or that there were no such videos. Amaro explained that she believed the parents "have been given the opportunity to show that they can change," but they "haven't taken advantage of these opportunities." She went on to testify that both parents continue to be in "denial," and although Father "is learning about

22

domestic violence," his denial causes "concern for the Agency" because it shows "the father has not taken any responsibility" for the June 2 incident.

Indeed, counsel for the Agency argued it was "not yet safe" to place the Children with either parent because they "are still in denial about what's going on." The juvenile court echoed the Agency's position when it ordered the Children removed from their parents' custody. It stated: "[U]nless and until the parents both understand the true scope of the domestic violence, the true seriousness of the domestic violence, then the issue remains dormant. It does not become treated and there is no hope for a safety plan because neither parent acknowledges that there are events and behaviors that need to be addressed and changed." Although troubling, the parents' "lack of transparency" or subsequent denial of the events that led to dependency is not sufficient, by itself, to justify removal of the Children from either parent's custody. (See *Henry V.*, *supra*, 119 Cal.App.4th at p. 525 ["The law requires that a child remain in parental custody pending the resolution of dependency proceedings, *despite the problems that led the court to take jurisdiction over the child*, unless the court is clearly convinced that such a disposition would harm the child."]; *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 289–290 (*Jasmine G.*).)

*Jasmine G.* is particularly instructive here. There, the Agency removed a 15-year-old child from her custodial parent's home because both parents used excessive corporal punishment to discipline the child for violating house rules. (*Jasmine G.*, *supra*, 82 Cal.App.4th at p. 285.) At the dispositional hearing, the juvenile court determined it would be unsafe to return the child to her mother, the custodial parent, or to her father's care. The court's determination was based largely on the social worker's testimony that "she did not believe [the child] should be returned because the 'parents seem to

23

*lack understanding of their responsibility and their roles in the incident* that brought [the child] to [the] social service agency's attention.' " (*Id.* at pp. 286–287, italics added.) The social worker also "complained about the parents' '*lack of cooperativeness and the hostility* that's been presented to [the social worker].' " (*Id.* at p. 286, italics added.) The Court of Appeal reversed the dispositional order. It held the social worker's "subjective belief" that the parents lacked understanding of their responsibility or roles in the events that led to dependency and the parents' lack of cooperativeness and hostility toward the Agency is *not* clear and convincing evidence of substantial danger to the child under section 361, subdivision (c)(1).[6] (*Jasmine G.*, at pp. 285, 289–290.)

Here, the unchallenged testimony from the social worker was that *it was safe* to return the Children to Father. Buttressing that testimony was the fact that, by the time of the dispositional hearing, the Agency had lifted the requirement that the parents visit the Children separately, and the juvenile court had granted the Agency further discretion to lift supervision of their visits altogether. Additionally, counsel for the Children voiced, in July 2021, her tentative support of unsupervised visits for Father based on reports that he had gained "a lot of insight" from his domestic violence classes, and

---

[6]    In declining to return the child to the father's care, the juvenile court stated it " 'wasn't convinced [he] was totally ready to put in practice what he learned in parenting.' " (*Jasmine G.*, *supra*, 82 Cal.App.4th at p. 288.) The Court of Appeal found this reason inadequate to support a finding there are " 'no reasonable means' " of preventing removal, as is additionally required under section 361, subdivision (c)(1). Although "strictly" dicta, because the father had not filed an appeal of his own, the court stated "that too made the [dispositional] order subject to reversal." (*Jasmine G.*, at pp. 292–293.) We discuss in the next section the juvenile court's finding there were no reasonable means to prevent the Children's removal.

requested at the dispositional hearing that the Children be returned to Father. The evidence also showed Father not only participated in parenting and domestic violence classes, but he "exceed[ed]" expectations and had "changed positively in terms of attitude and contribution" to the domestic violence program. Even Amaro agreed that Father was "doing extremely well" in his programs. Yet despite Father's progress, Amaro *believed* he had not shown change, had not taken responsibility, and was in denial about the events that led to dependency.[7] As in *Jasmine G.*, neither the social worker's "subjective belief" nor the juvenile court's "subjective perception" that Father had not "sufficiently 'internalized' " lessons from the events that led to dependency is clear and convincing evidence that the Children could not be safely returned to Father. (*Jasmine G.*, *supra*, 82 Cal.App.4th at pp. 288–289, 293.)

In sum, we conclude substantial evidence does not support the juvenile court's finding, by clear and convincing evidence, that there was or would be

---

7      While we do not minimize Father's recantation, we note that it occurred *after* the social worker Morales told him "the children might not be able to stay with him because he did not protect the children when the mother had a mental health crisis." When he recanted, Father reminded Morales of her statement that the Agency would take the Children from him because he did not call law enforcement, suggesting it was the reason for his change in position. Up until then, Father fully cooperated with the Agency. Thus, his recantation appears motivated more by fear of losing the Children than an unwillingness to acknowledge the domestic violence in his relationship with Mother or a refusal to change. But, as the Court of Appeal observed in *Jasmine G.*, we should be careful that "objectively measurable things," like a parent's progress in parenting and domestic violence classes, should not be "trumped by a parent's having *incorrect ideas* about social workers, government intervention in family life, and the whole juvenile justice 'system' that do not sit well with social workers." (*Jasmine G.*, *supra*, 82 Cal.App.4th at p. 290.)

25

substantial danger to the Children if they were returned home to Father. We reverse the dispositional orders as to Father on that basis alone.

B.   *There Was Insufficient Evidence of No Lesser Alternative Than Removal of the Children from Father's Custody*

Section 361, subdivision (c)(1), requires a second condition be met before the juvenile court may remove a child from her parent's custody. There must also be clear and convincing evidence of "no reasonable means" of protecting the child other than removal. (§ 361, subd. (c)(1).) In other words, "California law requires that there be *no lesser alternative* before a child may be removed from the home of his or her parent." (*Jasmine G.*, *supra*, 82 Cal.App.4th at p. 284, italics added.) As a lesser alternative, section 361 expressly requires the juvenile court to "consider, as a reasonable means to protect the [child]," "[t]he option of *removing an offending parent . . . from the home*." (§ 361, subd. (c)(1)(A), italics added.) But neither the Agency nor the juvenile court considered the option of ordering Mother to leave the home, as counsel for the Children had requested.

The Agency had considered only *one* option before removal—MGGM moving into the home with both parents. And the Agency rejected that option because it believed it was an insufficient safety plan for the Children because of Mother's perceived influence on MGGM. We note that MGGM was approved by the Agency to live with the parents and the Children as part of an earlier voluntary safety plan in January 2021, and she did so from February through April 2021, without any known problems.

Amaro admitted the Agency never explored any other alternatives to prevent removal of the Children from Father's custody, specifically the option of requiring Mother to move out of the home. When asked what the Agency "would need to know" to consider that option, Amaro testified the Agency would need to know who was going to provide daycare for the Children while

26

Father worked "from home" in the nursery. That is not an insurmountable obstacle. As counsel for Father suggested in cross examination of Amaro, MGGM could provide daycare while Father worked on-site, or MGGM could supervise Mother with the Children during daytime hours while Father worked, the Children return to him at night and Mother leave the home. Amaro testified she could not think of *any* risk posed by either scenario under a plan where Mother moved out. Rather, "that [was] something the Agency can explore" but it just had not thought of it "at this time."

The Agency has a duty to ensure that "reasonable efforts [are] made to prevent or eliminate removal" of the Children. (See Cal. Rules of Court, rule 5.690(a)(1)(B)(i) [mandating the Agency prepare a social study of the child and, if it recommends removal, the Agency "must include" a "discussion of the reasonable efforts made to prevent or eliminate removal"].) Moreover, California dependency laws require that removal be the "last resort." (*Henry V.*, *supra*, 119 Cal.App.4th at p. 525.) Here, it cannot be said that removal of the Children from their home was the last resort where the Agency admits there were other viable options left to "explore."

The Agency's failure to consider removal of Mother from the home as a lesser alternative to removal of the Children from Father is simply inexplicable. This is especially so because the Agency's safety plan in response to the June 2, 2021 incident—which triggered initiation of dependency proceedings—was for the Children to stay in the home *alone with Father*, and for Mother to move out. In that safety plan, the Agency did *not* require MGGM to move in with Father or to provide daycare to the Children while he worked. Further still, the parents fully complied with that safety plan. Mother moved out and saw the Children under the supervision of a third party. She then only returned to the home after the Agency had

27

removed the Children on June 10 when it obtained protective warrants and filed the dependency petitions.  Thus, the juvenile court was not correct when it found "the plans that have *always* been submitted for consideration" involved the parents living and co-parenting in the same home together. (Italics added.)  The parents, in fact, had demonstrated compliance with the Agency's safety plan that required them to live and parent their children separately and apart.

The juvenile court, however, determined there was no lesser alternative to removal because it found *the only option advanced by the Agency*—that MGGM move in with both parents—was "not an option as far as reasonable means" because MGGM testified she was only willing to move in with both parents but not Father alone.  We first observe that the juvenile court had a duty, in making the decision to remove the Children, to independently determine "whether reasonable efforts were made [by the Agency] to prevent or to eliminate the need for removal of [the Children] from [their] home."  (§ 361, subd. (e); see *In re Ashly F.* (2014) 225 Cal.App.4th 803, 809–810 (*Ashly F.*).)  Without that safeguard, "there is a danger the [A]gency's declarations that there were 'no reasonable means' other than removal 'by which the [children's] physical or emotional health may be protected' and that 'reasonable efforts were made to prevent or to eliminate the need for removal' can become merely a hollow formula."  (*Ashly F.*, at p. 810.)  But as we have already determined, the Agency failed to make reasonable efforts to prevent or eliminate removal of the Children.  (See Cal. Rules of Court, rule 5.690(a)(1)(B)(i); *Ashly F.*, at p. 809.)

Second, the juvenile court is required to consider the option of *ordering* an offending parent to leave the home, whether the option is explored or advanced by the Agency.  (§ 361, subd. (c)(1)(A); see e.g., *In re Michael S.*

28

(2016) 3 Cal.App.5th 977, 984–985 ["[I]f only one parent engages in the conduct underlying a dependency petition, the juvenile court might conclude that it is appropriate to remove the child only from the offending parent and allow the child to remain in the other parent's custody."].) Nothing in the record shows the juvenile court considered that option.

Instead, the court erroneously placed the burden *on Father* to "tak[e] affirmative steps to secure a residence for himself and the children, whether that is having the mother move out or getting an entirely different residence." The court also found the Agency did not "fail[ ] to undertake reasonable efforts" to keep the Children with Father because "*Father never affirmatively or proactively requested that*." (Italics added.) Thus, without Father taking those affirmative steps, the court declined to even consider returning the Children to Father despite the uncontroverted evidence that it was safe to do so. Instead, it expressed "hope that that can be broached *in the future*." (Italics added.) Like the Agency's statement that it "can explore," at a later time, the option of returning the Children to Father if Mother moved out, the court's statement that *that* was a plan that "can be broached in the future" demonstrates removal of the Children at the dispositional hearing was neither a lesser alternative nor the last resort. (*Henry V.*, *supra*, 119 Cal.App.4th at p. 525; see *id.* at p. 528 [Section 361 " 'embodies "an effort to shift the emphasis of the child dependency laws to maintaining children in their natural parent's homes where it was safe to do so." ' "].)

On this record, we conclude substantial evidence does not support the juvenile court's finding, by clear and convincing evidence, that there was no

29

lesser alternative to the Children's removal from Father. We reverse the dispositional orders as to Father on this additional and independent basis.

III.

*Substantial Evidence Does Not Support Removal of the Children from Mother's Custody*

We now address Mother's contention that substantial evidence does not support the juvenile court's dispositional orders removing the Children from her custody. Because the juvenile court did not separately address whether it was safe to place the Children with Mother, or the option of ordering Mother to leave the family home, much of our analysis regarding the sufficiency of the evidence supporting the findings necessary to justify removal of the Children from Father also applies to the dispositional orders regarding Mother. However, we acknowledge that Mother was the offending parent and consider whether that factor renders the evidence sufficient to support the juvenile court's section 361, subdivision (c)(1) findings as to Mother. We conclude it does not.

A.    *There Was Insufficient Evidence of Substantial Danger to the Children If Returned to Mother's Custody*

Mother was the offending parent, and was found to be the "domina[nt] aggressor" by the arresting agency in the December 2020 incident. However, Mother's aggression was directed at Father, and not M.V. or I.V.[8] We have no doubt the Children were at risk of suffering emotional harm as a result of the domestic violence between Mother and Father, but conclude that harm

---

[8]    We acknowledge there were some allegations regarding both physical and verbal aggression toward Father's older child, A.V., but the findings at issue in the present appeal concern only M.V. and I.V. and the juvenile court's jurisdiction over them was based solely on the allegations of domestic violence between Mother and Father.

30

was not sufficient, without more, to establish a substantial danger to the Children's well-being if returned to Mother's custody on the condition that she leave the family home.

"The law requires that a child remain in parental custody pending the resolution of dependency proceedings, *despite the problems that led the court to take jurisdiction over the child*, unless the court is clearly convinced that such a disposition would harm the child." (*Henry V., supra*, 119 Cal.App.4th at p. 525, italics added.) Thus, even a finding that a parent directly harmed a child through "abuse cannot alone provide the clear and convincing evidence necessary to justify removing a child." (*I.R., supra*, 61 Cal.App.5th at p. 520; accord *Ashly F., supra*, 225 Cal.App.4th at p. 811 ["A finding of parental abuse is not sufficient by itself to justify removing the child from the home."].) As the California Supreme Court has observed: "Even when one so seriously violates parental responsibilities, however, the strong countervailing interests unique to the status of parent must still be considered. A mere finding of parental abuse does not sever the legal and familial bond between parent and child. The Juvenile Court Law restricts judicial power to remove a child from the care and society of even an abusive or abuse-tolerant parent." (*Kiesha E., supra*, 6 Cal.4th at p. 77.) "Rather, the juvenile court must determine whether a child will be in substantial danger if permitted to remain in the parent's physical custody, considering not only the parent's past conduct, but also current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*I.R.*, at p. 520.)

Considering Mother's response to the Agency's intervention and the current circumstances in this case, we cannot conclude there was sufficient evidence to support the juvenile court's finding of substantial danger to the Children if returned to Mother's custody. This is particularly true when we

31

consider the heightened clear and convincing evidence standard set forth in section 361. Any danger here was based solely on the domestic violence between Mother and Father. Mother had successfully parented the Children on her own, without incident, while staying with the maternal grandmother in Los Angeles after the Agency first became involved. Mother also left the family home after the June incident, appropriately prioritizing the Children's need for safety and stability above her own, and the Agency reported no concerns during her visits with the Children while the case was pending.

The Court of Appeal addressed a similar situation in *I.R.*, *supra*, 61 Cal.App.5th 510. Like here, the only evidence of potential harm to the children derived from domestic violence between the parents. In the primary incident leading to dependency in *I.R.*, the father slapped the mother with enough force to knock her earring off while their infant child, I.R., and the mother's older child, D.R., were in the home. (*Id.* at p. 513.) However, neither child showed any signs of abuse or neglect and D.R. said he felt safe around the father. (*Id.* at p. 514.) The appellate court reversed the juvenile court's dispositional order removing I.R. from the father, finding "the record supports neither the court's finding that I.R. would be in substantial danger in [f]ather's custody, nor the finding that removing I.R. from [f]ather's custody was the only reasonable means of protecting her." (*Id.* at p. 519.) The court recognized, as we do, the serious threat that domestic violence poses to a child's well-being, but found "nothing in the record suggests [f]ather has ever been violent or aggressive outside the context of his relationship with [m]other." (*Id.* at p. 521.) As the court explained, "[t]he record thus contains only evidence suggesting danger to I.R. if the domestic

violence between [m]other and [f]ather continues—not danger resulting from I.R. being in [f]ather's care." (*Ibid.*)

The same is true here. The record contains evidence suggesting danger to M.V. and I.V. if the domestic violence between Mother and Father continues, but no other evidence of danger to the Children while in Mother's care. Again, there was no indication the Children suffered any harm while living separately or visiting with Mother. On the contrary, MGGM testified Mother was "very careful with the children." The Agency asserts this case is distinguishable from *I.R.* because the father in that case had already moved out of the home by the time of the disposition hearing, while here, it was never the intent of the parents to separate and co-parent from two separate households. The Agency fails to acknowledge, however, that the parents *did* live separately not once but twice when doing so was necessary to maintain custody of the Children. Moreover, the juvenile court had the power to order the parents to live and parent separately in order to eliminate removal of the Children from either parent's or both parents' custody.

In addition, Mother was making progress on her case plan and there was evidence that her ability to manage her relationship with Father was improving. She was participating in domestic violence classes, as well as parenting classes, and explained that she had learned to give herself space when needed and had agreed with Father that one of them would leave the home if they could not resolve a dispute. The Agency lifted the restriction of separate visits and, during an unannounced visit with the entire family in August, just one month before the disposition hearing, Amaro had "no concerns" and noted "the children seemed very happy and the parents were cordial" with one another. Thus, there was no reason to believe Mother would not be able to safely interact with Father on a more limited basis if the

33

Children were returned to their custody on the condition that they live separately.

As with Father, the Agency focuses on the fact that Mother failed to acknowledge the domestic violence that occurred in June at the dispositional hearing. For all the same reasons discussed with respect to Father, Mother's lack of cooperativeness or hostility towards the Agency is not clear and convincing evidence of substantial danger to the Children under section 361, subdivision (c)(1). (See *Jasmine G.*, *supra*, 82 Cal.App.4th at pp. 285, 289–290.) Mother did acknowledge the domestic violence that occurred in December, she was actively participating in services, and there was evidence she had gained insight from those services. Regardless, as we have explained, the sole cause of harm to the Children derived from domestic violence between Mother and Father, and the threat of that harm could be eliminated by dispositional orders requiring Mother and Father to live and parent separately.

Thus, while we acknowledge the significant harms caused by the domestic violence carried out by Mother in the family home, we conclude substantial evidence does not support the juvenile court's finding, by clear and convincing evidence, that there was or would be a substantial danger to the well-being of M.V. or I.V. if they were returned to Mother's custody, so long as she agreed to live and parent separately from Father.

B. *There Was Insufficient Evidence of No Lesser Alternative Than Removal of the Children from Mother's Custody*

As we have explained, section 361, subdivision (c)(1) also required the juvenile court to make a finding, by clear and convincing evidence, there were no reasonable means other than removal to protect the Children and, specifically, to consider the option of ordering Mother to leave the home. (§ 361, subd. (c)(1)(A).) For all the reasons we discussed with respect to

34

Father, neither the court nor the Agency gave due consideration to the option of ordering the removal of Mother from the home. The Agency admittedly *never explored* the option of requiring Mother to move out of the home as an alternative to prevent removal of the Children, even though Mother had voluntarily moved out twice before.

The juvenile court focused on the fact that Mother had moved back into the family home by the time of the dispositional hearing, but again, Mother did so only after the Children were removed. Likewise, in *Ashly F.* "[t]he record show[ed] that [the mother] removed herself from the family home following the detention hearing and had moved back just prior to the jurisdiction hearing *because the children were not present* and to save the family the cost of renting two residences." (*Ashly F., supra,* 225 Cal.App.4th at p. 810, italics added.) The appellate court in *Ashly F.* reversed a dispositional order placing the children with relatives because the juvenile court failed to consider the option of removing the offending parent from the home, "even though the evidence showed that it was available." (*Ibid.*) Here, Mother had demonstrated her willingness and ability to leave the family home on two separate occasions. The Children suffered no harm while Mother was living outside the family home, either in her care or in the care of Father, and there was no evidence Mother would not abide by an order requiring her to do so again if it meant the Children would not be removed from her or Father's care.

As we have discussed, the juvenile court did consider the alternative of having MGGM live in the home with Father—to provide care for the Children while Father worked—but concluded that was not an option because she was not willing to move into the home with Father alone. While we question whether it was appropriate for the Agency or the court to condition return of

the Children on the parents having a plan for daycare, these concerns could be readily eliminated by allowing Mother to care for the Children during Father's work hours, with or without the supervision of MGGM. The Agency was not able to identify *any* risk posed by a scenario in which Mother would care for the Children with MGGM's help while Father worked, even if she did so in the family home. Regardless, to the extent the court or the Agency had any remaining concerns, they could be addressed through additional "reasonable means," such as unannounced visits by the Agency and in-home counseling services. (See *Ashly F.*, *supra*, 225 Cal.App.4th at p. 810.) However, it does not appear that the court considered this option before removing the Children from Mother's custody altogether.

For these reasons, we conclude the juvenile court did not adequately consider whether there were "reasonable means" to protect the Children without removing them from Mother's custody and, thus, the dispositional orders are not supported by substantial evidence. In reaching that conclusion, we do not in any way condone the domestic violence committed by Mother, or seek to negate the significant emotional harms to the Children as a result of domestic violence in the home. Instead, we acknowledge the dispositional orders removing the Children from the custody of both parents represent a " 'critical firebreak' " that should be considered only as "a last resort," despite the problems that led to dependency in the first instance. (*Henry V.*, *supra*, 119 Cal.App.4th at pp. 525, 530.) We cannot conclude there

was substantial evidence to support a finding that the removal of the Children from Mother's—or Father's—care was the last resort in this case.

## DISPOSITION

The dispositional orders as to both Father and Mother are reversed and the matter is remanded for further proceedings in accordance with the law.[9]

DO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

AARON, J.

---

[9] We base our disposition on the facts existing at the time of the dispositional hearing which we determined from the record on appeal. On remand, the juvenile court must make its decision based on the facts existing at the time of the further proceedings.

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re M.V. et al., Persons Coming Under the Juvenile Court Law. | |
| | D079473 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. NJ15751A, B) |
| Plaintiff and Respondent, | |
| v. | |
| J.V. et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Appellants; | |
| M.V., a Minor, etc., et al., | |
| Appellants. | |

THE COURT:

The opinion in this case filed on April 22, 2022, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

O'ROURKE, Acting P. J.

Copies to:  All parties